IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| G.P., a minor; Karen P., on her own behalf and as mother and next friend of G.P.; | ) ) ) | |
| Plaintiffs; | ) ) | No. |
| v. | ) ) | Judge |
| Forest Claypool, in his official capacity as Chief Executive Officer of the Chicago Board of Education; Chicago Board of Education; Defendants. | ) ) ) ) ) ) | Jury Demanded |

## COMPLAINT

### INTRODUCTORY STATEMENT

1. This case is about the physical inaccessibility of a school building - Drummond Montessori Magnet School – and the impact that inaccessibility has on Plaintiffs' lives. In 2004, less than a year after completion of a compliance agreement with the Department of Education's Office of Civil Rights that required the Chicago Board of Education ("CPS") to make their magnet schools accessible, CPS located this new magnet school in an inaccessible, three-story building. In 2012, CPS admitted G.P. to this school as a three-year old in Pre-Kindergarten. In 2015, at age seven, G.P. developed a rare condition that severely limits her mobility and makes it generally impossible for her to climb stairs. Since 2015, G.P. has used a wheelchair and attends her second floor classroom by transferring off of her wheelchair at the stairwell then scooting on her bottom up the stairs.

2. Karen P., the mother, and G.P. bring this complaint under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*. ("ADA"), and Section 504

1

of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 791 *et seq*. ("Rehabilitation Act") to seek a declaration that the defendants illegally discriminated against them because of G.P.'s disability and to enjoin Defendants' prohibited conduct by ordering Defendants to make Drummond Montessori as accessible as it should have been when opened in 2004 or, in the alternative, ordering Defendants to provide a reasonable accommodation in the form of installation of a platform lift in the stairwell, or other, similar, relief.

## JURISDICTION

3. This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 (conferring jurisdiction over civil actions arising under laws of the United States) since they arise out of the protections provided in Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990.

4. Complainants' claims for declaratory and other relief are authorized by 28 U.S.C. §§ 2201 and 2202.

5. This Court is the appropriate venue under 28 U.S.C. § 1391(b) in that the defendants are subject to personal jurisdiction in this District, and the events giving rise to this Complaint occurred in this District.

## PARTIES

6. Karen P. and her daughter G.P. reside in Chicago, Illinois.

7. G.P. is an individual with Gaucher Disease, a condition that significantly limits her mobility and generally requires her to use a wheelchair.

8. G.P. is a qualified individual with a disability under the ADA and the Rehabilitation Act.

9. G.P. attends Drummond Montessori, a CPS Magnet School and intends to continue to attend her school.

10. Defendant Forest Claypool is the Chief Executive Officer of the Chicago Board of Education. He is sued in his official capacity only.

11. Defendant Chicago Board of Education, also known as CPS, is constituted within Illinois for administrative control and direction of public elementary schools in the City of Chicago, and is located in Illinois.

12. CPS constitutes a "local educational agency" within the meaning of § 504.29 U.S.C. § 794(b)(2)(B).

13. CPS is also a "public entity" as defined by Title II of the ADA. 42 U.S.C. § 12131(1).

## THE LAWS INVOLVED

## THE AMERICANS WITH DISABILITIES ACT (ADA)

14. The ADA contains four substantive Titles that address discrimination in the areas of employment, public services, public accommodations and commercial facilities, and telecommunications. Karen P. and G.P. bring this complaint under Title II of the ADA, which governs public services and protects individuals from discrimination on the basis of disability by public entities.

15. A public entity is defined to include "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

16. The law governing Title II is found at 42 U.S.C. § 12101 *et seq*. and is codified at 28 C.F.R. § 35.101 *et seq*.

17. Pursuant to the ADA, CPS cannot discriminate against G.P. or other persons with disabilities based solely on their disabilities. 42 U.S.C. § 12132 (a).

18. CPS also cannot discriminate against Karen P. because of her association with a person with a disability.

19. The ADA requires CPS to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

20. The ADA also prohibits CPS from selecting "the site or location of a facility" where the selection has the "effect of excluding individuals with disabilities" or "substantially impairing the accomplishment of the objectives of the service, program or activity." 28 C.F.R. § 35.130(b)(4).

21. The ADA also requires public entities to develop a transition plan that describes any obstacles to accessibility, the method that will be used to make programs accessible, and the schedule for achieving compliance, and that identifies the official responsible for implementing the plan. 28 C.F.R. § 35.150(d).

## THE REHABILITATION ACT

22. Section 504 of the Rehabilitation Act prohibits discrimination by recipients of federal funding against otherwise qualified individuals on the basis of their disabilities. 29 U.S.C. § 794.

23. The Rehabilitation Act and the ADA are functionally identical except that the Rehabilitation Act also requires proof of the receipt of federal funds. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

24. CPS's creation of a document titled "504 Plan" or identification of services as "504 services" represent CPS's effort to comply with the Rehabilitation Act even though the Act does not specifically require that a school district use that specific document, create an individualized plan, or provide a specific list of services. *CTL ex. Rel. Trebatoski v. Ashland School Dist.*, 743 F.3d 524, 529 (7th Cir. 2014).

## STATEMENT OF FACTS

25. On May 16, 1994, Access Living, a Center for Independent Living (CIL) for people with disabilities located in Chicago, Illinois, filed a complaint with the U.S. Department of Education's Office of Civil Rights alleging lack of physical access to CPS's magnet schools in violation of the ADA and Section 504 of the Rehabilitation Act.

26. On March 7, 1996, that complaint resulted in a Settlement Agreement that required CPS to make its magnet schools accessible.

27. To comply with the Settlement Agreement, from 1998 to 2002, CPS engaged in a set of construction projects to make Magnet Schools accessible. This effort was identified as OCR Projects Phase I and II, 1998-2002.

28. CPS completed this batch of construction required under OCR Projects Phase I and II, 1998-2002, by the end of 2003.

29. On or about August of 2004, CPS opened a Montessori magnet school in its existing Thomas Drummond Elementary School building.

30. When opened, Drummond Elementary was unique in the CPS system as it was the only school that provided a Montessori education from Pre-Kindergarten through Eighth Grade.

31. Drummond Elementary is not part of a larger network of schools. It provides its own unique educational experience only in the building at issue in this case.

32. The Thomas Drummond Elementary School Building was originally built in 1893. Its physical structure consists of three floors and a basement. Floors one through three are joined by two stairwells. Both stairwells provide full access to all floors other than the basement.

33. Currently, there is a lift that transports individuals who use wheelchairs from street level to the first floor.

34. There is no mechanism for transporting wheelchair users to the second floor, the third floor, or the basement.

35. CPS's undated Facility Assessment Report, based on a May 19, 2015 assessment, makes no reference to accessibility improvements either planned for or existing at Drummond Montessori, other than to indicate that the lift from the street level to the first floor requires regular maintenance.

36. Drummond Montessori offers multi-age classes divided into Early Childhood (Pre-Kindergarten – Kindergarten), Elementary I (Grades 1-3), Elementary II (Grades 4-6), and Middle School (Grades 7-8) groups. Each three-year cycle is led by the same teacher.

37. In a Montessori setting, each student stays with one teacher for a three years at a time. This consistency between student and teacher allows teachers to develop individual education plans for each student based on the teacher's assessment of each student's unique educational stage.

38. Drummond Montessori, reflecting the Montessori educational philosophy, offers its students exceptional consistency of teachers, students and the environment. This consistency is a central tenant of a Montessori education.

6

39. The intended result of this consistency in teachers, students and the environment is bonding between each individual student and their classes and between each individual student and the educational setting.

40. Because of each student's individually tailored educational plan and each student's individual bonding, each Montessori program is unique to each individual student. Montessori programs are not interchangeable.

41. In August of 2012, G.P. entered Drummond Montessori in the Early Childhood classroom.

42. The Early Childhood classroom is located on Drummond Montessori's first floor.

43. In the fall of 2015, G.P. entered the Elementary I class, which is located on the building's second floor. At that time, G.P. was able to walk up and down the stairwells.

44. At Drummond Montessori, the special classes, like gym and art, are spread throughout the building. The art class is in the basement level, the music class is on the first floor, the library is on the second floor, and the gym is on the third floor.

45. Since G.P. has been enrolled at Drummond Montessori for more than four years, G.P. has bonded with her teachers, classmates, and educational setting, as intended by the Montessori educational curriculum. She is currently in her second year of the three year Elementary One cycle.

46. Beyond any educational benefit, this bonding provided G.P. with a support network that consists of the students, the students' families, the teachers, and the support staff connected to Drummond Montessori.

47. Beginning in November of 2015, at age seven, G.P.'s Gaucher Disease caused her to develop avascular necrosis, the death of bone tissue due to the lack of blood supply. G.P.'s avascular necrosis first caused a bone infarct (an area of dead bone tissue) in her left leg.

48. This condition caused a severe limitation in G.P.'s ability to ambulate. G.P. began using a wheelchair for mobility and could no longer walk up the steps at Drummond Montessori.

49. On January 12, 2016, Karen P. participated in a 504 Conference with CPS staff to consider accommodations appropriate to G.P.'s condition.

50. G.P. was found eligible for 504 services because her impairment limited one or more major life activities.

51. The 504 Plan required paraprofessional support for G.P. when she was required to move between floors of Drummond's building, and required her to be carried in an evacuation chair between floors when necessary.

52. The 504 Plan also required a paraprofessional to provide personal care in the bathroom as needed.

53. Beginning in February of 2016, G.P.'s disease caused a second bone infarct to develop in G.P.'s right leg.

54. In March of 2016, G.P.'s condition lead to a fracture in her left hip, requiring a surgical pinning. Because of the additional limitations imposed by this condition, G.P. began an extended period home from school during which she received instruction at home from a teacher on Drummond's faculty.

55. On March 9, 2016, G.P.'s doctor, Barbara K. Burton, M.D. of the Northwestern University Feinberg School of Medicine, wrote a letter to Leslie Stoughton, G.P.'s Counselor/Case Manager at Drummond Montessori, explaining that G.P.'s condition requires her

8

to use a wheelchair and rely on an elevator or electric chair lift to transfer between floors. *See* March 9, 2016 Letter, attached as Exhibit A.

56. Dr. Burton also requested that G.P. be provided assistance while using a wheelchair accessible bathroom.

57. On April 5, 2016, Karen P. and her representatives, Rodney Estvan and Charles Petrof of Access Living, met with employees of CPS to conduct an additional § 504 meeting concerning G.P.'s accessibility needs.

58. At the time of this meeting, G.P. remained under physician's orders to stay at home. G.P.'s doctors had not yet provided a timeframe for her return to school, and G.P.'s specific needs when she did return were unclear.

59. During that April 5, 2016 meeting, CPS's Senior Legal Manager, Elizabeth Wagman, informed Karen P. that CPS would not return G.P. to Drummond Montessori because the building was not accessible and was not going to be made accessible to individuals who require a wheelchair.

60. In response, Karen P. asked if G.P.'s class could be relocated to the first floor, which is accessible by a lift, for at least the end of the 2015-2016 school year.

61. In response, Ms. Wagman stated that G.P.'s class would not be moved to the first floor, and that G.P., when she returned to school, would be transferred to a school with an accessible building.

62. Because of Ms. Wagman's position, there was no further discussion about the possibility of relocating G.P.'s classroom to the first floor.

63. Also during the April 5, 2016 meeting, Karen P. informed CPS that G.P. has a younger brother who attends Drummond and has the same medical condition as G.P. Although

9

the brother's mobility is not currently as limited as G.P.'s, he may later require the same level of accessibility G.P. currently requires.

64. At the end of the meeting, CPS prepared a 504 Plan that directed G.P. to be placed in an accessible building with access to an elevator.

65. Karen P. submitted a dissent to this plan that asked CPS to move G.P.'s class to the first floor of Drummond Montessori as an accommodation of her disability.

66. Karen P.'s dissent also requested that Drummond Montessori be made accessible so that G.P. could continue to receive the Montessori education provided by that magnet school through the eighth grade.

67. On April 7, 2016, Karen P., G.P. and Access Living of Metropolitan Chicago filed a Complaint of Discrimination with the U.S. Department of Education's Office for Civil Rights. The Complaint alleged that CPS's decision to locate a new magnet school in an inaccessible building, failure to make that building accessible, and refusal to move G.P.'s classroom to the first floor violated § 504 of the Rehabilitation Act and the ADA.

68. On April 7, 2016, in accord with its 504 Plan, CPS issued a letter to G.P.'s parents directing them to enroll G.P. in Oscar F. Mayer Elementary School.

69. CPS's involuntary transfer of G.P. out of Drummond Montessori is unacceptable for many reasons. The change would break G.P.'s relationship to her support networks, including her brother, interrupted the bonding which was created as part of her Montessori education, and remove her from her school, which, although a Magnet School, was located only three blocks from her home.

70. Additionally, Oscar F. Mayer Elementary School only provides a Montessori style education through Fifth Grade. Drummond Elementary provides a Montessori style education through Eighth Grade.

71. On April 28, 2016, counsel for G.P. notified Ms. Wagman in writing that G.P. would remain enrolled at Drummond Montessori, and repeated G.P.'s request that CPS move G.P.'s classroom to the first floor of the building.

72. G.P.'s counsel also stated that CPS failed to dialogue with G.P. regarding her requested accommodation.

73. In response, on May 6, 2016, CPS – per letter dated May 2, 2016 - gave G.P. until May 16, 2016 to enroll at Mayer Elementary. The letter further stated that after that date, G.P. could no longer attend Drummond Elementary School.

74. After negotiation between the parties, CPS agreed to postpone G.P.'s transfer and conduct an additional 504 Meeting.

75. On May 31, 2016, CPS conducted this additional 504 Meeting which was attended by Karen P. and Charles Petrof. With only days left in the school year, the parties agreed to a Plan that provided for G.P. to move between floors in the building "by using her arms in a seated position and crawling on hands and knees on the landing between flights." May 31, 2016 Chicago Public Schools 504 Plan, p. 4.

76. G.P. returned to Drummond Montessori following this May 31, 2016 Meeting.

77. On June 8, 2016, G.P. and Karen P. withdrew their complaint at the Office of Civil Rights.

78. On September 6, 2016, CPS conducted another 504 Meeting, again attended by Karen P. and Charles Petrof. This Plan continued to provide for G.P. to climb stairs in the scooting method described in the May 31, 2016 Plan.

79. As the fall progressed, it became apparent that G.P. would require adductor myotomy surgery to protect her weakened right hip from the collapsing of her femoral head. G.P.'s doctors scheduled the surgery for November 18, 2017.

80. On November 17, 2016, Dr. Burton, issued a second letter to CPS that stated that G.P. would not be able to use the stairs in her school without a lift during recovery from her surgery. *See* Nov. 17, 2016 Letter from Dr. Burton, attached as Exhibit B.

81. Dr. Burton also stated that G.P. would be similarly unable to attend school without a lift when the pin in her left femur was removed. The letter pointed out that G.P.'s "condition is not static, with periods of more and less significant mobility impairment." Ex. B.

82. Addressing the need for CPS to accommodate G.P.'s disability, Dr. Burton wrote:

> I also am concerned about the long term reliance on [G.P.'s] ability to move up and down her school stairs by scooting on her bottom. This form of movement is not medically prohibited when [G.P.] is able to tolerate it. However, it is not intended to be a long term solution to the challenge of moving [G.P.] up and down stairs in school.
>
> Even when [G.P.] is able to tolerate this form of movement, the need to protect [G.P.] from the jostling of her classmates on the stairs requires her to move between floors during scheduled class time. Following that procedure offers greater safety, but it takes [G.P.] out of her class during instruction. Long term, I am concerned about the amount of instruction [G.P.] will be denied by this process. Finally, forcing [G.P.] to move up and down the stairs on her bottom over a long period of time denies her personal dignity.

Ex. B.

83. On November 18, 2016, G.P. underwent adductor myotomy surgery and began a period of recovery at home without attending school.

12

84. On January 9, 2017, G.P. returned to school.

85. Because she was able to fully navigate her environment using a wheelchair before January 9, 2017, G.P. could have returned to school earlier if Drummond Montessori was accessible.

86. On January 26, 2017, Charles Petrof sent a letter by email to counsel for CPS asking to negotiate a reasonable accommodation for G.P.'s disability. The letter suggested installing a lift in the school, or exploring other similar possibilities. *See* Jan. 26, 2017 Letter from Charles Petrof, attached as Exhibit C.

87. Although CPS's counsel has corresponded with Mr. Petrof in response to that letter, CPS has not negotiated with G.P. or her counsel regarding the requested accommodation.

88. As of the filing of this complaint, CPS has not accommodated G.P.'s disability beyond permitting her to scoot up the stairs on her bottom.

## COUNT I: DISCRIMINATION UNDER § 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794 *et seq.*)

89. Paragraphs 1 – 88 above are incorporated as if set forth fully herein.

90. Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified individuals on the basis of their disabilities by recipients of federal funding. *See* 29 U.S.C. § 794.

91. Under § 504, entities receiving federal financial assistance must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

92. Defendants receive federal funding and are subject to the requirements of § 504.

13

93. G.P. is "handicapped" within the meaning of § 504.

94. G.P.'s impairment is only in regards to her mobility.

95. G.P. is entitled and qualified to participate in the unique educational program provided by Defendants at Drummond Montessori.

96. Karen P., G.P.'s mother, is an aggrieved person within the meaning of Section 504.

97. Defendants are discriminating against G.P. and Karen P. by refusing to dialogue with G.P. regarding her requested accommodation.

98. Defendants are discriminating against G.P. and Karen P. by refusing to grant G.P.'s requested accommodation.

99. Section 504 also prohibits Defendants from segregating individuals with disabilities, and requires Defendants to ensure that people with disabilities receive services in the most integrated setting.

100. Defendants' decision to establish and maintain a unique Montessori educational program in a building that is inaccessible to individuals with mobility impairments segregates G.P. and students like her on the basis of their disability.

101. Defendants' decision to establish and maintain a new educational program in a building that is inaccessible to individuals with mobility impairments, decades after passage of Section 504, is discrimination as defined by that Act.

102. Defendants discriminated against G.P. and Karen P. by limiting G.P.'s educational options solely because of G.P.'s mobility impairment.

103. Defendants' acts and omissions constitute a violation of G.P. and Karen P.'s rights under § 504. Defendants' conduct constitutes an ongoing and continuous violation of §

504, and unless restrained and enjoined from doing so, Defendants will continue to violate § 504. The Defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Plaintiffs have no adequate remedy at law.

## COUNT II: THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12131)

104. Paragraphs 1 – 88 above are incorporated as if set forth fully herein.

105. Title II of the ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of § 504 of the Rehabilitation Act to services provided by any public entity. See 42 U.S.C. § 12132.

106. Under the ADA, public entities must provide reasonable modifications when a policy, practice or procedure discriminates on the basis of disability. Public entities must also make reasonable accommodations in their rules, policies and practices when necessary to avoid discriminating against a person on the basis of a disability.

107. The ADA prohibits Defendants from segregating individuals with disabilities.

108. Defendants are public entities subject to the requirements of the ADA.

109. G.P. is a qualified individual with a disability within the meaning of the ADA.

110. Karen P. is an aggrieved person within the meaning of the ADA.

111. Defendants are discriminating against G.P. and Karen P. by refusing to dialogue with G.P. regarding her requested accommodation.

112. Defendants are discriminating against G.P. and Karen P. by refusing to grant G.P.'s requested accommodation.

113. Defendants' decision to establish and maintain a unique Montessori educational program in a building that is inaccessible to individuals with mobility impairments segregates G.P. and students like her on the basis of their disability.

114. Defendants' decision to establish and maintain a new educational program in a building that is inaccessible to individuals with mobility impairments, fourteen years after passage of the ADA, constitutes discrimination as defined by that Act.

115. Defendants have discriminated against G.P. and Karen P. in that Defendants are limiting G.P.'s educational options solely because of G.P.'s mobility impairment.

116. Defendants' acts and omissions constitute a violation of G.P. and Karen P.'s rights under the ADA. Defendants' conduct constitutes an ongoing and continuous violation of the ADA, and unless restrained and enjoined from doing so, Defendants will continue to violate the ADA. Defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Plaintiffs have no adequate remedy at law.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiffs pray that this Court:

A. Declare that CPS has discriminated against people with disabilities by siting a new magnet school in a building that is not accessible to individuals with mobility impairments.

B. Declare that CPS has discriminated against people with disabilities by failing to provide services, programs and activities in the most integrated setting possible.

C. Declare that CPS has discriminated against people with disabilities by adopting a transition plan that failed to provide for new magnet schools to be accessible.

D.      Declare that CPS violated the ADA and the Rehabilitation Act by failing to dialogue with Plaintiffs after Plaintiffs requested a reasonable accommodation.

E.      Declare that CPS violated the ADA and the Rehabilitation Act by failing to provide G.P. a reasonable accommodation.

F.      Enter a preliminary and permanent injunction against the Defendants ordering them to:

1. Make all floors of Drummond Montessori accessible to individuals with mobility impairments pursuant to the regulations in place in 2004 when Drummond Montessori was formed.

2. Make all bathrooms at Drummond Montessori wheelchair accessible pursuant to the regulations in place in 2004 when Drummond Montessori was formed.

3. Update its transition plan with the goal of making the CPS Magnet Schools accessible and providing for accessibility of any schools added to CPS's magnet school program.

4. Identify an official responsible for implementing the transition plan.

G.      In the alternative, enter a preliminary and permanent injunction against the Defendants ordering them to provide a reasonable accommodation to G.P. in the form of a platform lift, the relocation of her classroom to the first floor, or such other accommodation as is appropriate.

H.      Award Plaintiffs reasonable costs and attorneys' fees.

I.      Grant such other relief as this Court deems just and proper.

DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues properly triable by a jury.

Dated: March 10, 2017

                                  Respectfully Submitted,

                                  __/s/ Charles R. Petrof_____
                                  Charles R. Petrof,
                                  Senior Attorney at Access Living

Charles R. Petrof
Kenneth M. Walden
**Access Living of Metropolitan Chicago**
115 W. Chicago Ave.
Chicago, Illinois 60654
Phone:   (312) 640-2124
Fax:     (312) 640-2139
TTY:     (312) 640-2169
E-mail:    cpetrof@accessliving.org