**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| G.P., a minor; K.P., on her own behalf and as mother and next of friend to G.P., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 17-cv-1891 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| FORREST CLAYPOOL, in his official capacity as Chief Executive Officer of the Chicago Board of Education; CHICAGO BOARD OF EDUCATION, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' motion for partial summary judgment [72] and Defendant's cross-motion for summary judgment [75]. For the reasons set forth below, Plaintiffs' motion for partial summary judgment [72] is denied, and Defendant's cross motion for summary judgment [75] is granted. Final judgment will be entered in favor of Defendants and against Plaintiffs under Federal Rule of Civil Procedure 58. Civil case terminated.[1]

---

[1] Plaintiffs' first amended complaint again lists Forrest Claypool, the former CEO of Defendant Chicago Board of Education, as a Defendant in his official capacity only. [62, ¶ 10.] The Court previously dismissed Defendant Claypool, explaining that a suit against him in his official capacity was coterminous with the suit against the Defendant Board. [29]; see also *Molina v. Latronico*, --- F. Supp. 3d ---, 2019 WL 7290615, at *5 (N.D. Ill. Dec. 27, 2019) (quoting *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989)) ("[A] suit against a[n] [] official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). The Court explained that it would only allow amendment to the complaint to add an individual defendant if Plaintiffs could "articulate a separate, viable claim against an individual official." [29.] The Court assumes that Defendant Claypool's inclusion in the amended complaint was an oversight. And, in any event, since the official capacity case against him was really a suit against the Defendant Board, *Molina*, 2019 WL 7290615, at *5, to the extent that Plaintiffs attempted to revive their case against him he is entitled to summary judgment as well.

## I. Background

Generally, the Court deals with cross-motions for summary judgment one at a time, construing all facts and drawing all reasonable inference in favor of the non-moving party. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). Because the disputed issues in this case center on legal issues, see [82 at 2], the Court does not do so here. Moreover, the Court grants Defendant's motion for summary judgment, so it *a fortiori* denies Plaintiffs' partial motion seeking the same relief. Accordingly, to the extent that any inferences could be made, the Court makes them in favor of Plaintiff. The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *King v. Chapman*, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013).

The Court must first address Defendant's arguments about Plaintiffs' compliance with Local Rule 56.1.[2] Local Rule 56.1(b)(3) requires a party opposing summary judgment to file a response to the movant's Rule 56.1 statement with numbered paragraphs responding to "each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," as well as "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." A Local Rule 56.1 statement is not the place for legal argumentation and unsupported denials. It is "well within the district court's discretion"

---

[2] Plaintiffs also seek to have three of their statements of fact admitted because of Defendant's evasive admissions. These facts are immaterial to the central legal analysis in this case, but, in any event, the Court deems them admitted.

to strictly enforce Local Rule 56.1. *Wilson v. Kautex, Inc.*, 371 Fed. Appx. 663, 664 (7th Cir. 2010) (affirming district court's requirement of strict compliance with Local Rule 56.1 for *pro se* litigant).

Defendant argues that certain of Plaintiffs' Local Rule 56.1(b)(3) responses are non-compliant because they are unsupported by citations to the record, are purely argumentative, or embedded new facts within their responses as opposed to filing a separate statement of additional facts. Most of these disputes, however, trace back to Defendant's use of legal jargon in their own statements of fact. See, *e.g.*, [83, ¶ 29 (Defendant asserting, and Plaintiffs denying, that certain accommodations were "reasonable")]. Plaintiffs' pointing out that the "reasonableness" of any accommodation is a legal conclusion does not violate the Local Rule, and the Court properly disregards such of Plaintiffs' (and Defendant's) statements that speak to legal, as opposed to factual, conclusions. Others of Plaintiffs' denials involve semantic hair-splitting that ultimately has no bearing on the factual or legal issues in this case. See, *e.g.*, [*id.*, ¶¶ 11–12 (disputing whether Defendant's disability accommodation "team" is really a "team" because parents were not included in decision making, even though Defendant admitted that the parents had no final say in decision making).][3] To the extent that Plaintiffs dispute word choice, the Court considers the underlying facts admitted. That said, the Court must consider the facts in the light most favorable to the non-moving party, so as the Court analyzes Defendant's motion for summary judgment, it must draw all inferences against Defendant, which is essentially all that Plaintiffs' denials ask the Court to do.

---

[3] One important semantic dispute, discussed in the legal analysis section below, involves the use of the word "program." Compare Section III(B), with [83, ¶ 68]. In ADA cases, "program" is sometimes used as a term of art. Thus, as the Court recounts the background facts, the Court uses this term only in the colloquial sense.

Finally, Plaintiffs weave new facts into their denials without following the proper procedure. The requirement that each new fact be included in a separate list is not idle: the purpose of the Local Rule is to simplify matters for both the parties and the Court by clearly delineating what facts are actually in dispute. Interweaving new facts, old facts, legal argumentation, and unsupported statements make it difficult to discern where the factual disputes actually lie. Nonetheless, the Court reviewed all of the statements at issue and concluded that with one exception, all are immaterial for the reasons discussed above or are ultimately irrelevant because the Court does not reach the issue. The most important disputed fact raised in Plaintiffs' response is whether G.P. was given an option of what accessible school she would like to attend. Defendant claims that G.P. was given a choice between two Montessori schools. [83, ¶ 15.] Citing a new affidavit attached to their Local Rule 56.1 response, Plaintiffs dispute that any choice was given, claiming that only one option (Oscar Mayer Magnet School) was ever on the table. See [*id.* ("At no time did CPS 'offer' or otherwise require G.P. to transfer to Suder [Montessori Magnet School].")]. Elsewhere, however, Plaintiff concedes that "[Defendant] continues to offer to transfer G.P. to either Suder or Mayer immediately." [*Id.*, ¶ 33.] Because Plaintiffs' denial is internally contradictory and improperly introduces new facts, the Court deems Defendant's Fact Statement ¶ 15 admitted.

The case at bar concerns the extent of a school district's legal obligations to accommodate a student who develops mobility issues and can no longer access her school. Plaintiff G.P. attends Drummond Montessori Magnet School ("Drummond"), a school with a Montessori curriculum operated by Defendant Chicago Board of Education ("Defendant," though it is also commonly known as Chicago Public Schools ("CPS")) and located in a building owned by Defendant (the "Drummond Building"). [85, ¶ 2.] Construction on the Drummond Building began in 1891 and a

neighborhood elementary school officially opened in the building in 1893. [83, ¶ 34.] In 2004, Defendant converted the neighborhood school into the city's first public Montessori school. [85, ¶¶ 12–13]; [83, ¶ 41.] Soon thereafter, two additional public Montessori schools, the Oscar Mayer Magnet School and the Suder Montessori Magnet School, were established. [88, ¶ 15.]

Montessori curricula have several distinctive features. Classrooms are organized by "cycle," with three grades in each classroom rather than the traditional single grade per classroom. By way of illustration, the cycles at Drummond consist of: (a) pre-K and kindergarten, (b) first-through-third grades, (c) fourth through sixth grades, and (d) seventh and eighth grade. [85, ¶ 9.] Students work off of personalized work plans that they are responsible for completing with the teacher's assistance and guidance. [*id.*, ¶ 10.] Finally, the Montessori schools use an inquiry-based pedagogical approach, which frequently involves multi-sensory elements (such as, for example, teaching students how to count through the use of "counting beads"). [*Id.*, ¶ 11]; [83, ¶ 69.]

While Drummond's and Suder's Montessori programs extend through eighth grade, Mayer's Montessori program is unavailable following fifth grade. [85, ¶ 38]; [83, ¶ 43.] Mayer does, however, offer an IB (presumably, international baccalaureate) program, which is built on the same principles and values as Montessori, and also utilizes an inquiry-based model. [83, ¶ 69.] Otherwise, the schools all utilize the exact same Montessori philosophy and materials. [83, ¶ 43.] There are, however, other small differences between the schools, such as the fact that Mayer and Drummond are both considered top-notch "Level 1+ schools," whereas Suder is a "Level 1" school. See generally [83-3; 83-4; 83-5]; [83, ¶ 55.].[4]

---

[4] Plaintiffs have not explained Defendant's school ranking systems, despite using differences between rankings as a potential basis for denying summary judgment. As the Court can glean from Plaintiffs' attached exhibits, however, there are five rankings, from best to worst: 1+, 1, 2+, 2, and 3. [83-3]; [83-4]; [83-5]. Schools in the first three ratings are all, apparently, in "good standing." [83-4]; [83-5]. Thus, even taking the facts in the light most favorable to Plaintiffs, a score of 1 is, at the very least, a decent score. Defendant also, apparently, provides an alternate ranking system called the "SQRP," which ranks schools

As is relevant to this litigation, there is one other very important difference between the Montessori schools—the Drummond Building is not accessible to those with ambulatory disabilities, whereas Suder and Mayer are housed in accessible facilities. [83, ¶ 15.] Specifically, those who need a wheelchair or walker or otherwise have difficulty walking can use an incline lift to access the first floor of the Drummond Building without climbing any steps. [83, ¶ 37.] But once inside, only the first floor is fully accessible. The second and third floors can only be accessed by climbing the stairs. [*Id.*, ¶ 38.] Apparently, there are no bathrooms on the third floor, so students must descend several flights of stairs (80 steps in total) to use the bathroom. [*Id.*, ¶ 40.] The art room, gym, and cafeteria are also not accessible. [*Id.*, ¶ 39]; see also [85, ¶ 54.] Drummond is not alone in this regard, as only 50% of Chicago public schools are fully accessible by individuals with disabilities (with another 25% being partially accessible). [85, ¶ 23.] Notwithstanding the first-floor accessibility, the Drummond Building is considered by Defendant to be fully inaccessible. [*Id.*, ¶ 25.]

Defendant uses a single portal for parents to apply to the plethora of schools and school types within its elementary school system. [83, ¶¶ 56–57.] The Montessori schools discussed above are "magnet" schools, and do not have geographical catchment areas; the class of magnet schools they belong to is called "Choice Schools." [85, ¶ 8]; [83, ¶¶ 58, 66.] Choice Schools can have various focuses, including Montessori, IB, and foreign language. [83, ¶ 66.] Students (or, in

---

from worst to best on a one to five scale. Drummond scored a 4, whereas Suder scored a 3.5. [83-4]; [83-5]. Plaintiffs also question Mayer's fealty to the Montessori model, as it may employ instructors in its upper level classrooms who were not trained by a licensed Montessori program. See [83, ¶ 33.] This new fact introduced in the body of a response to Defendant's Local Rule statement violated the Local Rules. The Court need not determine whether this additional fact should be considered, though, because, as explained below, even taking it as true, Defendant is still entitled to summary judgment.

practice, parents), may apply to up to 20 such schools, and are selected for admission via lottery.[5] [85, ¶ 14–15.] Successful admittance to one school (or acceptance of an offer of admission) does not impact a student's placement on the waitlist for others. [83, ¶¶ 63–65.] Defendant encourages parents to research schools extensively before applying. [85, ¶ 16–17.] Students with mobility issues are still allowed to apply to any of the Choice Schools, even inaccessible ones. [83, ¶¶ 58, 70.] If a student with disabilities is admitted to an inaccessible school, Defendant will transfer him or her to another magnet school offering a comparable curriculum, and provide transportation upon enrollment. [83, ¶ 70.][6] This mechanism allows the student with disabilities to trump any waitlist. See [*id.*] Defendant has at least one accessible facility per Choice School type. [83, ¶ 67.]

Plaintiff G.P. is a minor child and Plaintiff K.P. is G.P.'s mother (collectively, "Plaintiffs"). G.P. has Gaucher Disease, a condition that significantly limits her mobility and requires her to use a wheelchair at times. [85, ¶ 1.] G.P. has been enrolled in Drummond since 2012, when she enrolled as a three-year-old. [*Id.*, ¶ 19.] Her parents applied to the school for her because of its Montessori curriculum and convenient location. [*Id.*, ¶ 20–21.] They were also drawn to the school over private alternatives because Drummond is public and socio-economically diverse. [85, ¶ 22.]

---

[5] The admission criteria for neighborhood schools are different—it is undisputed that G.P. would have been automatically enrolled her "attendance area" school had she not been accepted to a Choice School via the lottery. [88, ¶ 2.]

[6] Plaintiff objects to Defendant's use of the phrase "magnet program" in its statement of facts to describe transferring between schools offering a similar curriculum. [*Id.*] Even viewing the statement in the light most favorable to Plaintiff, however, the context makes clear that Defendant is referring to curricular offerings. Indeed, even Plaintiff defines magnet schools in reference to their curricular areas of expertise: "In CPS, magnet schools are schools that specialize in one particular area, such as math/science, Montessori, or Humanities." [85, ¶ 8.] As discussed below, "program" is also a term of art in Title II litigation; as such, to the extent that either party attempts to shoehorn legal argument into their respective Local Rule statements, that argument is disregarded.

G.P.'s Gaucher disease began to flare up three years later, in the fall of 2015. [85, ¶ 31.] She developed avascular necrosis, the death of bone tissue due to the lack of blood supply, and resultantly experienced severe pain. [*Id.*] She experienced difficulty moving around the school building, particularly as her classroom was on the second floor. [*Id.*, ¶¶ 31–32.] As an interim solution, the school's "Section 504 Team"[7] suggested that G.P. be assisted in walking up and down the stairs by a paraprofessional, and carried in an evacuation chair as necessary. [*Id.*, ¶ 34.]

In March 2016, G.P.'s condition worsened, and her hip bones broke, requiring surgery. [*Id.*, ¶ 33.] G.P.'s doctor explained that G.P.'s medical condition required her to use a wheelchair and to rely on an elevator or electric chair lift to transfer between floors. [*Id.*, ¶ 35.] The 504 Team subsequently reconvened and directed that G.P. be transferred to a school in an accessible building over opposition from Plaintiffs. [*Id.*, ¶ 36.] Defendant then sent a series of letters directing Plaintiffs to enroll G.P. in Mayer, as it is an accessible school offering the Montessori curriculum. [*Id.*, ¶ 38.] Defendant also offered to transfer G.P. to Suder. [83, ¶ 33.] Plaintiffs refused, instead demanding that Defendant install an elevator in the Drummond Building or, in the alternative, relocate G.P.'s class room to the first floor. [*Id.*, ¶¶ 37, 39.]

Because Plaintiffs have declined a transfer and Defendant has not made the requested structural changes to the Drummond Building or location of G.P.'s classroom, she has had to rely on intermediate solutions to access her classroom. For example, G.P. has dragged herself up the

---

[7] Presumably named after Section 504 of the Rehabilitation Act (which forbids federal grantees from discriminating against persons with disabilities), these teams meet to discuss a student's disabilities, and the accommodations that the school will provide to bring the school into compliance with the Rehabilitation Act. See [83, ¶¶ 10–14.] Section 504 teams are comprised of the parent, parent advocates/lawyers, and school/district staff, such as the principal, school Section 504 Coordinator, general education teacher, nurse, physical therapist, district representatives and the school's attorneys. [*Id.*, ¶ 11.] Although the CPS staff may confer with parents about what accommodations will be provided to a student, Defendant and its agents retain final decision-making authority—as such, Plaintiffs object that these are truly "teams," because the parents are sidelined when there is a disagreement. See [*id.*]. The Court notes Plaintiffs' objection, and interprets the facts regarding the Section 504 teams in the light most favorable to them.

stairs while in a seated position, crawled on her hands and knees, lost instruction time, missed direct participation in activities such as art class and lunchtime, and been carried in an evacuation chair. [85, ¶¶ 52–54.] The parties have continued to negotiate (and litigate) over what accommodations the school would afford G.P. See, *e.g.*, generally [18]; [24]; see also [83, ¶¶ 27–29.] In the settlement discussions held at the outset of the case, the Court learned in detail of the challenges that G.P.'s condition present for her, her parents, her teachers and school administrators, and Defendant, the entity charged with administering the school system in which G.P. is enrolled. The Court appreciates the efforts that everyone involved made to reach a temporary arrangement that obviated the need for a ruling on Plaintiff's request for preliminary injunctive relief. What remains for decision, however, is whether Defendants are legally obligated to accede to Plaintiffs' preferred outcome in this case.

In Plaintiffs' first amended complaint [62], they bring suit under the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). They seek declarations that: (a) Defendant discriminated against students with disabilities by siting a new magnet program in an inaccessible building; (b) Defendant discriminated against students with disabilities by failing to provide students with mobility impairments the ability to attend any school of their choice; (c) Defendant segregates students with disabilities by providing them with fewer practical choices; (d) Defendant discriminates against students with disabilities by failing to deliver programs in the most integrated setting possible; (e) Defendant's transition plan to its new GoCPS system discriminates against people with disabilities by failing to provide the same number of school options; (f) Defendant discriminated against students with disabilities by siting a new magnet program at an inaccessible location after it entered into a settlement agreement with the U.S. Department of Education; (g) Defendant failed to dialogue with Plaintiffs regarding requested

accommodations; and (h) Defendant failed to provide reasonable accommodations. [62 at 18–19.] Plaintiffs also ask the Court to enjoin Defendant to, *inter alia*, construct an elevator in the Drummond Building. Before the Court are Plaintiffs' motion for partial summary judgment and Defendant's cross motion for summary judgment.

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Rule 56 makes clear that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Id. In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). But the non-movant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation and quotation marks omitted). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 324.

10

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III.  Analysis

### A.  Americans with Disability Act

Title II of the Americans with Disabilities Act states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. "To prove a *prima facie* case of discrimination under Title II, a plaintiff must show: (1) that [s]he is a qualified individual with a disability; (2) that [s]he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) that the denial or discrimination was by

11

reason of [her] disability." *Lacy v. Cook County, Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) (citations and internal quotation marks omitted). "Because the relevant provisions of the Rehabilitation Act and its regulations are materially identical to their ADA counterparts, courts construe and apply them in a consistent manner." *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016) (cleaned up). The parties agree that since Defendant is a recipient of federal funds, the Rehabilitation Act is implicated here, and that the claims are "functionally identical" to those brought under the ADA. [64, ¶ 103]; [62, ¶ 23 (citing *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)]; [77 at 9 (citing *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)]. As such, the Court approaches both the Rehabilitation Act and ADA claims under the more fully-fleshed out ADA regulatory framework.

Title II's "broad directive has been developed further by the Department of Justice through implementing regulations, accessibility standards, and administrative guidance." *Lacy*, 897 F.3d at 852 (citing 42 U.S.C. § 12134).[8] A public entity may neither "deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service" nor "afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(i)–(ii). "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.*, § 35.130(b)(7)(i).

---

[8] Neither party has argued that the regulations are anything other than controlling, so the Court treats them as such. *Cf. Lacy*, 897 F.3d at 852 n.2 (noting that it is unclear whether the regulations are entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), but citing them as authoritative); see also, *e.g.*, *National Federation of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016) (affording the regulations "controlling weight") (citation and quotation marks omitted); *Babcock v. Michigan*, 812 F.3d 531, 535 n.4 (6th Cir. 2016) (same).

Facilities built after January 1992 are subject to stringent structural accessibility requirements. See generally *id.*, § 35.151. An "existing facility," that is, a facility built before then, is subject to different standards. See generally *id.*, § 35.150. Here, the general rule is that a "public entity shall operate each service, program, or activity so that the service, program, or activity, *when viewed in its entirety*, is readily accessible to and usable by individuals with disabilities." *Id.*, § 35.150(a) (emphasis added). In focusing on *program* accessibility as opposed to *facility* accessibility, the regulations do not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities," nor do they mandate structural changes to existing buildings where other methods of program delivery are effective.[9] *Id.*, § 35.150(a)(1); § 35.150(b)(1); see also *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004) ("Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities[.] * * * [I]n the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services."). The regulations provide several examples of ways that a public entity can provide program accessibility without making all of its facilities accessible, including "reassignment of services to accessible buildings," "delivery of services at alternate accessible sites," and "any other methods that result in making its services,

---

[9] In the context of the existing facilities regulation, "program accessibility" is a term of art. It is used to describe compliance with § 35.150 generally, and thus encompasses services and activities as well as programs. See *Daubert v. Lindsay Unified School Dist.*, 760 F.3d 982, 986 (9th Cir. 2014); *contra* [87 at 4]. Thus, courts adopt a flexible definition of "program" and do not require the cohesiveness that the term suggests. See *Daubert*, 760 F.3d at 987 (a football game is a program); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (medical licensing, zoning, parole hearings, and sidewalk maintenance are programs). Although the phrase "program" is defined capaciously, however, this does not bear on how broadly to define a *particular* program. See *Rodriguez v. County of San Diego*, 2016 WL 4515860, at *4 (S.D. Cal Feb. 9, 2016) (recognizing that the line between these distinct analyses can be "blurred").

programs, or activities readily accessible to and usable by individuals with disabilities."
§ 35.150(b)(1). In providing alternate programs, however, a public entity must "give priority to
those methods that offer services, programs, and activities to qualified individuals with disabilities
in the most integrated setting appropriate." *Id.*

### B. Definition of "Program" and Methods of Program Accessibility

"Much turns on how the service, program, or activity at issue is characterized." *Rodriguez
v. County of San Diego*, 2016 WL 4515860, at *4 (S.D. Cal. Feb. 9, 2016) (citing *Daubert v.
Lindsay Unified School Dist.*, 760 F.3d 982, 987 (9th Cir. 2014)). Unfortunately, "the regulations
do not provide any objective criteria for evaluating program accessibility." *Greer v. Richardson
Independent School Dist.*, 472 Fed. Appx. 287, 291 (5th Cir. 2012). Moreover, "[t]here is scant
case law interpreting these regulations." *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1067 (N.D. Ill.
2016); see also *Greer*, 472 Fed. Appx. at 292 n.3 (collecting out-of-circuit cases because there was
"little precedent in this circuit").[10]

"Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was
intended to ensure broad access to public services, while, at the same time, providing public entities
with the flexibility to choose how best to make access available." *Daubert*, 760 F.3d at 986
(quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000)) (quotation marks
omitted); see also *Greer*, 472 Fed. Appx. at 292 n.3 (quoting same). *Daubert* is particularly

---

[10] The Court could only locate a handful of Seventh Circuit or Northern District of Illinois cases that cited
28 C.F.R. § 35.150, and none that elucidated the standard for program access. See *Lacy*, 897 F.3d at 868
(§ 35.150 did not apply, because the facilities in question had been recently renovated, thus triggering
another regulation requiring compliance with the generally applicable building codes); *Clemons*, 168 F.
Supp. 3d at 1067 (§ 35.150 did not apply because jail in question was built after 1992); *Lacy v. Dart*, 2015
WL 5921810, at *11 (N.D. Ill. Oct. 8, 2015) (explaining that complete inaccessibility of courthouse ramps
and bathrooms constituted an outright service denial to pretrial detainees required to attend court, so not
considering the definition of "program"); *Doe v. Board of Trustees of University of Illinois*, 429 F. Supp.
2d 930, 939 (N.D. Ill. 2006) (holding that state university was entitled to immunity under the Eleventh
Amendment).

instructive, both in terms of how to define a program and how to determine whether it is readily accessible. In *Daubert*, the plaintiff was a person with disabilities who periodically attended high school football games. 760 F.3d at 984. The bleachers, which were constructed prior to 1992, were not accessible, and the plaintiff had to use alternatives that failed to provide the camaraderie of watching from a crowd and afforded inferior views to boot. *Id.* at 984–85, 987. The Ninth Circuit held that the "program" in question was the football game, and did not include the social experience of watching the game with the crowd. *Id.* at 987. The court reasoned that for purposes of "program accessibility," a program "is a normal function of a governmental entity," that is, "anything a public entity *does*." *Id.*, quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002); see also *Rodriguez*, 2016 WL 4515860, *7 (discussing *Daubert*'s application of this standard). In that case, what the school district did was put on a football game, and the bleachers or any social experience related to them were purely "incidental." *Id.* Moreover, the program (the game) was made accessible by providing alternative viewing locations—notwithstanding the plaintiff's allegations that the views were inferior, the undisputed facts showed that at least some of them provided unobstructed views, which was enough to provide access when looking at the program as a whole. *Id.* at 988; see also *Greer*, 472 Fed. Appx. at 293–94 (same). Finally, although the alternate accessible viewing sites were not as integrated as the bleachers, they were appropriately integrated, because the viewing sites were near the bleachers or in other places where spectators congregated. *Daubert*, 760 F.3d at 988.

The Ninth Circuit elaborated on these holdings in *Kirola v. City of San Francisco*, 860 F.3d 1164 (9th Cir. 2017), a case involving persons with disabilities' access to San Francisco's parks. The premise of Plaintiffs' argument was that "certain parks offer unique benefits, and that when those parks are inaccessible, the existence of other, accessible parks does not provide an adequate

substitute." 860 F.3d at 1184 (noting that several marquee attractions in the storied Golden Gate Park were wholly inaccessible). The court, however, rejected these arguments, because "perfect accessibility is not the applicable standard under 28 C.F.R. § 35.150." *Id.* Indeed, "28 C.F.R. § 35.150 requires only that the program as a whole be accessible, not that all access barriers—and not even all of those at the most iconic locations—be remedied." *Id.* By way of contrast, the Kansas State Fair did not have enough accessible seating and restrooms, had minimal signage, and several attractions that were entirely inaccessible. Although the fairground was an existing structure, its services and activities were, taken as a whole, inaccessible. *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003), abrogated on other grounds, *Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007).

The *Americans with Disabilities Act: Title II Technical Assistance Manual* (1993) (hereinafter "*TA Manual*") also provides helpful examples of how to properly define the program in question and alternative methods of program access.[11]

> ILLUSTRATION: A rural, one-room library has an entrance with several steps. The library can make its services accessible in several ways. It may construct a simple wooden ramp quickly and at relatively low cost. Alternatively, individuals with mobility impairments may be provided access to the library's services through a bookmobile, by special messenger service, through use of clerical aides, or by any other method that makes the resources of the library "readily accessible." Priority should be given, however, to constructing a ramp because that is the method that offers library services to individuals with disabilities and others in the same setting.

---

[11] The *TA Manual* is regularly consulted to flesh out the regulatory framework of the ADA. See, *e.g.*, *Babcock*, 812 F.3d at 542 (Rogers, J., concurring); *Fortyune v. City of Lomita*, 766 F.3d 1098, 1104 (9th Cir. 2014); *Chaffin*, 348 F.3d at 862; see also *Kisor v. Wilkie*, 588 U.S. ___, 139 S.Ct. 2400, 2415 (2019) (explaining that agency interpretations of their own unambiguous regulations may be consulted as persuasive authority, and such interpretations are entitled to deference when the underlying regulations are ambiguous).

*TA Manual*, 5.2000. This illustration underscores that structural changes are not necessarily required for inaccessible existing facilities, particularly if services can be provided in an integrated setting. As with *Daubert*, *Greer,* and *Kirola*, the *TA Manual* suggests that the "program" in question should not be defined too narrowly. One could convincingly argue that a library's "services" are far more than a book-delivery mechanism—libraries provide unique opportunities for study, socialization, meditation, and discovery. See Martin Wolk, *Why Susan Orlean Sees a Bright Future for Libraries*, L.A. Times, June 20, 2019, available online at https://www.latimes.com/books/la-ca-jc-susanorlean-library-bookclub-20190619-story.html (discussing Susan Orlean, *The Library Book* (2018), and concluding, "[b]ooks are still at the heart of the mission, but libraries are so much more than books"); Stephen King, *It* at 212–14, 223–25 (1981). But the *TA Manual*, like *Greer* and *Daubert*, is careful not to define the program too narrowly and boils the services provided by the library to what the library actually *does*—book delivery and clerical assistance from librarians.[12] *Id.*; see also *Barden*, 292 F.3d at 1073 (avoiding letting inquiry "disintegrate into needless hair-splitting arguments") (citation omitted). As such, alternative forms of program accessibility need not recreate every aspect of the entire program. Likewise, the illustration seems to contemplate that an urban library system could fulfill the program access mandate by having some accessible facilities—hence its focus on a single-site, rural library.

---

[12] In the years since the *TA Manual* was written in 1994, some have held that a library must also provide meaningful access to computers. *Vazquez v. Municipality of Juncos*, 756 F.Supp.2d 154, 163 (D.P.R. 2010) (yes); but see *ADA Update: A Primer for State and Local Governments* at *9 (2015) (suggesting that computer access is still not part of the program offered by libraries). Regardless, both approaches still offer an arguably cramped view of services provided by libraries.

### C.      Program Accessibility and Summary Judgment

Program definition and accessibility present a complicated mix of law and fact. Both parties here implicitly assume that they are matters of law for the Court to decide—hence their cross-motions under Rule 56 for judgment as a matter of law. And many courts implicitly do the same, especially for program definition. See, *e.g.*, *Clemons*, 168 F. Supp. 3d at 1066 (granting summary judgment to plaintiff because plaintiff lacked access, "[a]lthough the issue is not free from doubt"); *Daubert*, 760 F.3d at 987 (defining the scope of the program in question as a matter of law and granting summary judgment to defendants, notwithstanding record evidence that the accessible alternatives provided to plaintiff were inferior).

As the Court reads the cases, program definition is a matter of law. See, *e.g.*, *Daubert*, 760 F.3d at 986; *Twede v. University of Washington*, 309 F. Supp. 3d 886, 903 (W.D. Wash. 2018) (distinguishing *Fortyune*, 766 F.3d 1098, and dismissing complaint because parking lots on college campus are not services—but parking lots provided by the city are services); *Kerrigan v. Philadelphia Bd. of Election*, 2008 WL 3562521, at *17 (E.D. Penn. Aug. 14, 2008) (concluding, at summary judgment, that "the program of voting includes the opportunity to vote in one's local, assigned, polling place, where the voter can take advantage of the opportunities to meet election judges, see their neighbors, and obtain information from candidates' representatives"). When there is genuine ambiguity about what a government entity is actually doing (that is, the traditional government function at issue), however, at least one court has held that factual disputes about the definition of a program may foreclose summary judgment in limited circumstances. Compare, *e.g.*, *Rodriguez*, 2016 WL 4515860 at *8 n.7 (granting summary judgment to public parks department on one count, because the program offered by the department was "those [parks and services] offered in the Lakeside area, or within a several mile radius of the Park at issue," and parks within

18

that radius were, viewed as a whole, accessible), with *id.*, at \*14 (factual dispute as to whether hiking trails within a park were provided for transportation or recreational purposes, precluded defining the scope of a sub-program at summary judgment). It noted, however, that "[t]he exact question the trier of fact would resolve \* \* \* appears to lie in relatively uncharted territory." *Id.*, \*10 (discussing the respective reversals of summary judgment in *Barden*, 292 F.3d 1073, and *Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014)).

In contrast, accessibility is more liable to hinge on disputed facts. See, *e.g.*, *Kerrigan*, 2008 WL 3562521, at \*18 (summary judgment inappropriate where voters with disabilities allege that defendant city put up bureaucratic and logistical hurdles and catch-22's to obtaining absentee ballots); see also *Kirola*, 860 F.3d at 1183–84 (applying clearly-erroneous standard to findings related to accessibility, but defining program only in reference to legal authorities).

## D.    Instant Case

With all of this in mind, the Court turns to the central allegations in this case. Preliminarily, neither party disputes that the Drummond Building is an existing facility within the meaning of § 35.150—indeed, it was built almost 100 years before the ADA was passed. The parties also do not dispute that G.P. is a qualified person under the ADA (and thus the Rehabilitation Act). The parties further do not dispute that the facilities that house Suder and Mayer are handicapped accessible, that G.P.'s transfer would have been automatic, and that Defendant would provide G.P. with transportation to either school (which were, in any event, located in relatively close proximity to Plaintiffs' home). That is, there is no dispute that Suder or Mayer were readily accessible

The parties' dispute, therefore boils down to the second prong of a prima facie Title II case: whether Plaintiff was discriminated against. This, in turn, hinges of the legal question of program definition, *i.e.*, whether different, accessible schools offering comparable curricula offer the same

programs as inaccessible ones. In the instant motion, Defendant claims that it is entitled to summary judgment on all of Plaintiffs' claims—that Defendant's (a) GoCPS program denies students with disabilities program access; (b) G.P. was denied program access to Drummond; (c) Defendant's refusals to modify the Drummond Building or otherwise accommodate G.P.'s disability were discriminatory; (d) siting a Montessori program at a non-accessible school violated federal regulations and the Rehabilitation Act; and (e) policy of maintaining non-compliant facilities segregates those with ambulatory disabilities.

### 1. G.P. was not denied program access

Plaintiffs argue that G.P. was denied program access in several ways. First, Plaintiffs contend that the entire structure of Chicago's magnet school placement system discriminates against those with disabilities. Second, they assert that Suder and Mayer do not offer the same program as Drummond. Third, they claim that G.P. could not fully access the social aspects of a Montessori curriculum if she was uprooted from her chosen school. Defendant counters that each of these arguments conflates facilities access and program access or views the "program" in question too narrowly. According to Defendant, because G.P. has ready access to a public Montessori education, it has not violated the ADA.

As an initial matter, students with disabilities have access to the GoCPS program. As the Court understands the argument, Plaintiffs submit that students with disabilities such as G.P. do not have access to the full array of CPS schools become some are inaccessible. The GoCPS program therefore treats them differently, because they cannot always attend the school of their choice. There is no indication, however, that the GoCPS program itself treats students with disabilities differently. Indeed, students with disabilities may apply to any CPS school, meaning that they have full access to the selection apparatus. It seems as though Plaintiffs' real objection is

20

not to the GoCPS program itself, but to the fact that some facilities are inaccessible. To the extent that Plaintiffs assert this claim as it relates to existing facilities, however, the regulations explicitly preclude this argument. It is undisputed that there is at least one accessible school offering each curriculum. Thus, Defendant has "delivered services at alternate accessible sites" satisfying the flexible standards that apply for programs offered at existing facilities. 28 C.F.R. § 35.150; *Parker*, 225 F.3d at 6.

Plaintiffs' counterarguments would make a hash of the regulatory framework. First, Plaintiff argues that each school is a program, and therefore it is impossible to provide the services at alternate locations. This argument conflates facilities with programs, and has been widely rejected. See, *e.g.*, *Daubert*, 760 F.3d at 987; *Greer*, 472 Fed. Appx. at 294; *Twede*, 309 F. Supp. 3d at 901. Every school is, to a certain extent, unique, but that does not mean that every school must be accessible; rather, the program offered by CPS, taken as a whole, must be accessible. *Kirola*, 860 F.3d at 1184.

Plaintiffs next argue that this is de-facto segregation, because students with disabilities are herded into accessible facilities, while students without disabilities have their pick of schools. It is true that the regulations require that integrated service delivery be prioritized to the extent that it is appropriate. 28 C.F.R. § 35.150(b)(1). But the regulations also bless service delivery at alternate accessible sites, which necessarily means that those with disabilities will be overrepresented at the accessible locations. See *id.* Plaintiffs' contention that any disparity in the proportions of persons with disabilities necessarily violates the regulation would render the alternative accessible sites language a nullity. And steps less than mandatory, complete integration are uniformly tolerated— even if program access is provided by providing an entirely separate (but nearby) location. *Greer*, 472 Fed. Appx. at 293 ("[W]e disagree with [plaintiff's] suggestion that any separation from the

general public seating area is *ipso facto* discrimination"); see also, *e.g.*, *Kirola*, 860 F.3d at 1184; *Daubert*, 760 F.3d at 988; *Rodriguez*, 2016 WL 4515860, at *14. The Court also finds the *TA Manual*'s definition persuasive: a public entity satisfies 28 C.F.R. § 35.150's integration requirement by providing "services to individuals with disabilities and others in the same setting."[13] *TA Manual* 5.2000. Defendant has satisfied its initial burden of demonstrating that services are delivered in an appropriately integrated setting by demonstrating that all accessible Choice Schools are open to all applicants. Plaintiffs have not cited any record evidence that the services at accessible schools are not provided to everyone in the same setting, and thus have failed to demonstrate the existence of a dispute of material fact.

Plaintiffs' citation to *Chadam v. Palo Alto Unified School District*, 666 Fed. Appx. 615 (9th Cir. 2016), also misses the mark. That case, which is readily distinguishable, involved a student who was kicked out of his neighborhood school for having the genetic markers of cystic fibrosis, seemingly in violation of his school district's enrollment policies. 666 Fed. Appx. at 616. Because the case had nothing to do with program accessibility under 28 C.F.R. § 35.150, it is inapposite. The troubling allegations in *Chadam* also are far afield from the issue in this case— namely, Plaintiffs' resistance to transfer between non-neighborhood schools offering identical curricula. Plaintiffs' other citations to Title II cases likewise are inapposite because they do not involve existing facilities and therefore do not implicate the flexible standards embodied in 28 C.F.R. § 35.150. *Contra* [82 at 6].

---

[13] The Court need not determine whether deference is warranted under *Kisor*, because it finds the *TA Manual*'s definition a persuasive interpretation of the regulation in question, at least as compared to Plaintiffs' approach. On that note, the regulations only require that services be provided in an *appropriately* integrated environment, 28 C.F.R. § 35.150(b)(1), not that every facility be fully integrated, or even that service delivery must be "as integrated as possible." *Contra*, *e.g.* [82 at 14 (discussing a similarly worded regulation)].

Plaintiffs also claim a program denial on the ground that the exact Montessori program available at Drummond is not available elsewhere. According to Plaintiffs, Mayer does not strictly follow the Montessori curriculum through eighth grade, and Suder is an inferior school. Defendant argues that, when viewing the Montessori and Montessori-style curricular offerings as a whole, they are accessible to those with ambulatory disabilities. The Court need not determine the exact scope of the "program" offered by CPS, because viewing Drummond, Suder, and Mayer as a whole, a Montessori curriculum is available to students who cannot access Drummond. Though "[t]here may be something unique about every" school, "perfect accessibility is not the applicable standard under 28 C.F.R. § 35.150." *Kirola*, 860 F.3d at 1184. Both the *TA Manual* and the case law underscore that a public entity can fulfill its program accessibility requirements without having to offer *identical* programs and services. Indeed, these resources openly contemplate that services missing an element that a plaintiff could find important can fulfill a public entity's duties so long as the core program is accessible. See, *e.g.*, *Daubert*, 760 F.3d at 988 (affirming summary judgment where disabled persons were provided arguably inferior, but unobstructed, seats); *Kirola*, 860 F.3d at 1184 (explaining that a city's failure to make the best park attractions accessible is not actionable under Title II if the parks system, viewed as a whole, is accessible).

Here, the Montessori program, taken as a whole, is accessible. There is no dispute that Mayer is a comparably ranked to Drummond and offers a Montessori curriculum through the fifth grade and a curriculum similar to Montessori thereafter. Even if some of the teachers were not trained at an official Montessori location, there is no dispute that the Montessori curriculum is offered through fifth grade. Suder is also an apparently well-ranked school that offers the Montessori curriculum through 8th grade. Even if it is not as highly regarded as Drummond, it is undisputed that a pre-K through eight Montessori education is readily accessible there and that the

school is in "good standing." There is nothing in the record suggesting that Suder is so inferior that it cannot be said to offer a Montessori education—indeed, even taking the record evidence in the light most favorable to Plaintiffs, Suder is at worst a decent "Level 1" school. Thus, students with disabilities seeking a Montessori education who draw into Drummond apparently have multiple options, which, when viewed as a whole, provide ready accessibility to a Montessori education.

Plaintiffs' final proposed definition of program denial is, admittedly, a closer call. They argue that under the very specific facts here, G.P. was denied access to a Montessori education, because a core element of Montessori is cycling with the same students and teacher for up to three years at a time. A transfer to Suder or Mayer would have deprived her of the continuity built into the Montessori program. Defendant counters that this is incidental to the program that Drummond provided, which was the implementation of a curriculum. Likewise, Defendant highlights that under Plaintiffs' preferred, restrictive definitions of program access, it would have been impossible to immediately provide the complete immersive Montessori experience at Drummond.

The only authority the Court could locate that touches upon this issue is opaque: the government's ADA implementation materials underscore that when a group dynamic is important (such as with a group-therapy class), a public entity denies program accessibility if it only offers one-on-one programming. *ADA Update: A Primer for State and Local Governments*, at *10. At the very least, this guidance does not mandate that a public entity must keep groups intact, and, if anything, it suggests that the "program accessibility" question should be scoped to the level of *any* group, not a *specific* group. And the high school football game cases are of little use, because the social aspects of a Montessori education are arguably closer to the core program than watching a game.

The Court is sympathetic to G.P.'s situation, but Plaintiffs' argument fails as a matter of law. The Court must hone its program definition to focus on the "normal government activity" in question—that is, what Defendant *does*. *Daubert*, 760 F.3d at 987 (quoting *Barden*, 292 F.3d at 1076). The activity, service, and program are all the provision of an education—in this case, a Montessori or Montessori-style education. Teachers are not themselves government programs, services, or activities—rather they *deliver* services, and are therefore incidental to the core program (education following a set curriculum). A definition of the program that excludes specific teachers avoids conflating programs with the specifics of a given location (*i.e.*, a facility) and affords public entities at least some flexibility in providing program accessibility.

### 2.    With program access, Defendant did not need to modify its policies

Plaintiffs argue that, in any event, 28 C.F.R. § 35.130 imposes an independent obligation to make reasonable modifications, regardless of whether accessibility is provided pursuant to 28 C.F.R. § 35.150.[14] Specifically, Plaintiffs want this Court to require Defendant to (in descending order of priority) build an elevator in the Drummond Building, install a lift in the Drummond Building, relocate G.P.'s classroom to accessible floors, or build a ramp to the basement. Defendant counters that there is no freestanding right to reasonable modifications if a program offered in an existing facility is otherwise readily accessible.[15]

---

[14] Plaintiffs consistently refer to "reasonable accommodations," though the regulations implementing Title II only speak of "reasonable modifications in policies, practices, and procedures." The Court need not determine the extent to which the "reasonable modification" requirement in Title II mirrors the "reasonable accommodation" requirements of Title I and Title III, because it concludes that no modification was necessary. Compare *Lacy*, 897 F.3d at 853 (noting that the modification requirement "parallels" the accommodation requirement), with *Kiman v. New Hampshire Dept. of Corrections*, 451 F.3d 274, 283 n.9 (1st Cir. 2006) (citing *McGary v. City of Portland*, 386 F.3d 1259, 1266 n. 3 (9th Cir. 2004)) (treating accommodation cases as persuasive authority for modification cases).

[15] Because the Court concludes that additional reasonable modifications are not required when a program delivered at an existing facility is otherwise readily accessible, it need not delve into how reasonableness is determined or whether Defendant is otherwise excepted from modifying its policies.

The Court is mindful of the fact that the failure to reasonably modify policies and practices is generally actionable under Title II, see, *e.g.*, *Washington v. Indiana High School Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999), but the request for modifications must stem from a service denial or act of discrimination in the first place. *Wagoner*, 778 F.3d at 593 (holding that "disconcerting allegations" of "humiliation, as when [plaintiff] had to crawl off the regular van because it did not accommodate his wheelchair * * * do not amount to a denial of services within the meaning of [the ADA or Rehabilitation Act]."); *Pascuiti v. New York Yankees*, 87 F. Supp. 2d 221, 223 (S.D.N.Y. 1999) (citing *Borkowski v. Valley Central School District*, 63 F.3d 131, 137–40 (2d Cir.1995)) (requiring that as an element of their Title II reasonable accommodation case, "plaintiffs must[] [] prove that the Stadium, when viewed in its entirety, is not readily accessible to and usable by individuals with disabilities"); *cf. Alexander v. Choate*, 469 U.S. 287, 301 (1985) (*"[T]o assure meaningful access*, reasonable accommodations in the grantee's program or benefit may have to be made") (emphasis added). Indeed, *Wagoner* arguably resolves this issue: the lengths that G.P. went through to be with her teachers and classmates are heart wrenching, but because she was not denied access to a service, program, or activity, they do not carry the day legally. *Wagoner*, 778 F.3d at 593.

In any event, program access's logical antecedence to the modification requirement is explicit and implicit in the regulatory scheme. The general anti-discrimination provision only requires that public entities "make reasonable modifications in policies, practices, or procedures *when the modifications are necessary to avoid discrimination* on the basis of disability." 28 C.F.R. §35.130(b)(7)(i) (emphasis added). Here, there was no discrimination: because Defendant made its Montessori program accessible, no modification was necessary. Moreover, Plaintiffs' reading of the regulatory scheme would render 28 C.F.R. § 35.150 largely unintelligible and § 35.150(b)

entirely superfluous—what is the point of listing alternative methods through which a public entity can comply with the ADA's program access mandate if those methods would not actually bring the entity into compliance? See *Greer*, 472 Fed. Appx. at 294–95; see also, *e.g.*, *Clemons*, 168 F. Supp. 3d at 1068 (declining to interpret regulations such that one portion would be "superfluous").[16]

Plaintiffs' citations to the contrary are all inapposite. Many of them are from Title III cases, instead of Title II. See [73 at 12 (citing cases that discuss "public accommodations" and "businesses," not public entities)]. Title III is a different provision of law that neither defines its scope in reference to "programs" nor provides such flexible exceptions to existing facilities—public entities are not required to hew to Title III's strictures. *Rodriguez*, 2016 WL 4515860 at *5; see also *TA Manual*, 5.2000 ("Unlike private entities under title III, public entities are not required to remove barriers from each facility, even if removal is readily achievable.")

Plaintiffs' Title II cases also miss the mark. Most of them seem to involve newer facilities, and therefore do not implicate 28 C.F.R. § 35.150. See [82 at 6 (collecting cases that do not grapple with program accessibility for existing facilities)]. And the holding of *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), was limited to parsing the overlap between the ADA/Rehabilitation Act and the exhaustion requirement found in another federal statute not at issue here. 137 S. Ct. at

---

[16] Plaintiff argues that this reading eviscerates the reasonable accommodation requirement by allowing public entities to unreasonably refuse to modify its practices or facilities. This may very well lead to questionable or even sub-optimal outcomes, but neither the regulations nor the case law support a different result. See *TA Manual*, 5.2000 (public entities need not make existing facilities accessible, even if doing would be "readily achievable"). To be clear, however, a public entity still must provide additional reasonable modifications to its policies if the chosen method of program accessibility fails to make the program readily accessible. See, *e.g.*, *Kerrigan*, 2008 WL 3562521, at *18. Moreover, in many cases public entities may be required to structurally modify their facilities in order to make their programs accessible. *Rodriguez*, 2016 WL 4515860, at *5 (citing *TA Manual*, 5.2000); *Pascuiti*, 87 F. Supp. 2d at 225. Here, however, there is no dispute that a Montessori education was readily accessible, because Defendant offered to transfer G.P. to a nearby, accessible school offering a comparable service. Because there was nothing defective about the method of achieving program access, no alternative modifications were required by the regulations.

755–57. In distinguishing the statutes, *Fry* discussed general hypothetical questions that may come up in disability-related litigation against schools, and explained which statute would control in each hypothetical. *Id.* at 756–57. One example was a school that requires a student with a disability to be carried because it lacks access ramps. *Id.* at 756. In this discussion, however, the Court did not cite, let alone discuss, the various regulations that govern existing facilities and program accessibility.[17] *Id.* Though the discussion of Title II is no doubt useful in distinguishing it from other statutes in the education accessibility space, it has no bearing on the technical and infrequently litigated issue before the Court today.

### 3. Defendant is entitled to summary judgment on the remaining claims

Having determined that (1) G.P. was afforded program access and (2) Defendant need not modify its policies in light of Plaintiffs' refusal to accept transfer to the accessible programs, the Court now turns to Plaintiffs' remaining claims.

First, 28 C.F.R. § 35.130(b)(4) is inapplicable because it does not prevent public entities from siting new programs at existing facilities.[18] The regulation in question merely prevents public entities from making decisions about "the site or location of a *facility*" that "have the effect of excluding individuals with disabilities." *Id.* (emphasis added). Plaintiffs claim that this regulation prevents Defendant from siting new programs at inaccessible locations. But Defendant did not make any decisions about *facility* location. Rather, Defendant chose to place a Montessori *program* at an existing facility. The location of the Drummond Building (the facility in question) was

---

[17] The *TA Manual* does explain that "carrying an individual with a disability" is generally not "considered an acceptable method *of achieving program access*." *TA Manual*, 5.2000 (emphasis added). As explained above, G.P.'s having been carried is not relevant, because that is not how Defendant achieved program access; rather program access was achieved by offering comparable programming at alternative locations.

[18] Plaintiffs further argue that Defendant failed to properly move for summary judgment on this count, but Defendant's motion for summary judgment was clear that the operative regulation is 28 C.F.R. § 35.150 because the Drummond Building is an existing facility, and that facilities and programs are different.

determined a century before the ADA was passed, and, in any event, Defendant offers accessible alternatives (*i.e.*, no one is excluded), so this regulation is irrelevant.

Second, even taking the facts in the light most favorable to Plaintiff, Montessori services are delivered in an appropriately integrated setting. To the extent that 28 C.F.R. 35.130(d) imposes a separate requirement on public entities delivering programs at existing facilities, the Court incorporates its earlier discussions of the integration requirement and the interplay between § 35.130 and § 35.150.

Finally, Defendant is entitled to summary judgment on any Rehabilitation Act claims, because both parties agree that they are "functionally identical" to ADA claims. [62, ¶ 23 (citing *Wagoner*, 778 F.3d at 592)]; [77 at 9 (citing *Jaros*, 684 F.3d at 672)]. Plaintiffs' arguments on this point miss the mark. According to Plaintiffs, there is a settlement agreement from 1996 that prevents CPS from siting a magnet school in an inaccessible building, and this is somehow actionable under the Rehabilitation Act. But even according to Plaintiffs, Defendant has proved its Rehabilitation Act case by prevailing on the "functionally identical" ADA claim. [62, ¶ 23.] Thus, in prevailing on the ADA counts, Defendant established that it was entitled to summary judgment as to the Rehabilitation Act, and the burden shifted to Plaintiffs to provide admissible evidence that would establish an issue of material fact for trial—or at the very least explain how the Rehabilitation Act has anything to do with a claim that would seemingly arise under Illinois contract law. *Harney*, 526 F.3d at 1104 (explicating the burden-shifting framework for summary judgment); *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) ("[A] settlement agreement is considered a contract, and construction and enforcement of settlement agreements are governed

by principles of contract law."). They have not done so, and cannot rest on allegations in their complaint, so summary judgment is warranted.[19] *Harney*, 526 F.3d at 1104.

## IV.     Conclusion

For the reasons set forth above, Plaintiffs' motion for partial summary judgment [72] is denied, and Defendant's motion for summary judgment [75] is granted. Final judgment will be entered in favor of Defendants and against Plaintiffs under Federal Rule of Civil Procedure 58. Civil case terminated.

Dated: June 12, 2020

_____
Robert M. Dow, Jr.
United States District Judge

---

[19] Plaintiffs appear to base this claim on a settlement agreement reached between Defendant and the Office of Civil Rights in 1996. [62, ¶¶ 26, 131(F).] Though they acknowledge that the copy of this settlement included as an exhibit to Defendant's Local Rule statement is correct, they have moved the Court to strike it as inadequately authenticated. [88, ¶ 11.] Because the Court's ADA analysis extends to the Rehabilitation Act claims, this request is moot. But given that summary judgment is the "put up or shut up" moment in a lawsuit, *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007), it is puzzling that Plaintiffs claim relief under a contract and then argue that the Court should not review the document.